First case this morning is 4-12-0368. It is in re Marriage of Janssen for the appellant, Diana Cherry, for the appellee, Mr. Hepp. Ms. Cherry, please proceed. May it please the court, I'm going to take issues out of order and I probably won't get to all the issues. But if there are any questions, I would be happy to entertain them. The first issue I wanted to talk about was the fourth one raised in our brief, which has to do with what the trial court set as the value of what he termed other farm assets. Again, this is a farm dissolution, farm assets involved. He had separate values that he set for machinery, for the farmland, but there was one lump that he called other farm assets, which included the cattle, the crops, the chemicals, and the operating loans. He set an amount at the time that he made his decision saying he was going to set the value at the difference between what he had otherwise awarded each of the parties, which came out to be $15,818. The judgment of dissolution was entered in September of 2010. Evidence, the trial of the property division occurred after, this was a bifurcated case, and the court's decision was after December of 2010. The evidence of the value of these other farm assets as of the time of the divorce judgment being entered was that there was cattle with a value, and this value was set by Mr. Jansen, by Greg Jansen, of $460,000 for his cattle. And he said that he had $275,000 worth of, or $275,000 of debt, which was not otherwise included in the court's other allocations. So that would lead to a value of $185,000. In addition to that, he had crops, which had been planted. He testified that his usual procedure was to harvest them and sell them the following calendar year. And that was further evidence at trial that that's what he was doing. So as of the date of the judgment being entered, we had a net value of $185,000 for the cattle and the loan, and then we had the crops, which the value of those could not really be determined at the time of trial because they hadn't been sold yet. He submitted with error for the judge to use a value of $15,818 for all of those assets. It should be $185,000 plus the value of the crops. And in terms of how the crops should be allocated or the value of them allocated, our proposal is that the court follow a procedure. It's similar to that followed when there were stock options and such, which is you can set a formula for determining how the allocation of the crops' value should be made and then how that actually occurs when the crops are sold. But at a minimum, we have $185,000 for the cattle and the operating loan, which should have been used in dividing the mural assets. And what is your perception of how the court arrived at the $15,818? My perception is what he said, which is he used the total of what he calculated he had given Christina and the total of what he calculated, net values of what he had given Christina, net values of what he had given Greg Jansen, and just took that number, plugged it in so that he comes out with an equal division. But that's not in any way related to what the value was of the assets. Now, when he discusses what he was doing in terms of the value, he discusses the debt that by the time trial had ended, Greg Jansen testified that he had incurred. But this is a farm where his usual process was to borrow against operating notes at the end of the year, prepay chemicals, prepay seeds. And I would note that the judge in making this thought process didn't take into account that the money he had used, that he had borrowed, there was an asset there. Which hadn't really been disclosed, which was how much seed and how much chemical and how much fertilizer he had purchased with that money. But there was an asset there also. I don't know that we have to get into that because, again, this was all post the date of the judgment of dissolution. And that is the appropriate date for determining what the debt was and what the amount of debt was. Now, in response to our argument, Greg's argument basically was that the court properly used the date of trial for these valuations, which when we discussed it in the brief, I don't think that was correct even under this court's decision in Mathis. But it clearly was not correct based on the Supreme Court's decision in Mathis, which I just recently supplemented. I think the court, in its 70-page decision, made it fairly clear that placing a value on these other farm assets was a very difficult thing to do and therefore relied upon an equitable division. If you look at the chart, which is Exhibit A, it appears that, at least from a reading of his brother Lincoln's decision, he tried to do the best he could given the complexity of the valuation regarding those farm assets. Well, if you read his discussion of trying to value the other... First of all, I don't agree that it was that difficult to establish a value for these other farm assets. They were evidence. The value for the cattle, the amount of the debt, that's the value. The judge goes through the discussion about if it gets sold and cash flow, which isn't really what is the issue. It's what the current value is of these items. And one thing I would mention, he talks about the crops. One thing I would mention with regard to the cattle is that the evidence was by Mr. Jansen that he didn't make money with the cattle. It was, according to him, it was a lost venture. So it's not as if this was income that he relies on. But the court pretty much rejected that contention, didn't it? No. About the cattle? Well, he didn't include the cattle income in his calculation of income. He expressed some doubt as to whether it was true, but he didn't include that income in calculating Mr. Jansen's net income. And so he really didn't attribute any income to it. My point is when the trial judge was talking about the cash flow from the crops, the cattle isn't a factor in that cash flow because he didn't, according to the records, didn't make money off of that. If there are no other questions on that issue, there are three issues that we raised with regard to marital contribution to the farm called the Clayton Farm. The Clayton Farm, just briefly, was a farm that Mr. Jansen had acquired about two years before the marriage. The purchase price was $200. He financed the purchase with a $210,000 mortgage, so had a $90,000 down payment. At the time of the marriage, the mortgage was $134,000. And at the time of divorce, the value of the farmland was now $1,728,000. So there was a significant increase in value of that farmland. The first issue I want to talk about is actually the last one I raised with regard to the contribution. The trial judge found that there was a contribution, a marital contribution to the farmland, and set that contribution at $221,500. The court determined that Christy Jansen would be reimbursed for half of that contribution. Implicit, inherent in that, I should say, is that Greg Jansen also gets half of that contribution. And he gets it because he gets to keep the property that received that contribution. So he gets his half, but the judge didn't take that into account. He was dividing the marital estate. And again, he was dividing it. He was intending to divide it equally. It's clear, I believe, from his memorandum opinion. That's what he was intending to do. He goes through and he says, you get half, you get half, you get half, you get half, this balances this, and then he does a table and comes down with 50% agreed. But he forgets to take into account that $110,000 that Greg Jansen was receiving as a result of his share of the marital contribution to the farmland. So we submit that that was error, and that should have been taken into account, and therefore there should be an adjustment of the property division. I want to make sure I understand what you're arguing here. Again, I'm looking at Exhibit A, which the court attached, where it sets forth a summary of marital property division. And the court has an item, reimbursement from non-marital estate for Clayton Farm. And under respondent, there's nothing listed. What is your argument as to what should have been listed there? $110,000. $110,000? Correct. The same number as he would put on your Christie's column. But he didn't, and therefore when he cuts down to the total and he has them having equal amounts, it's actually not equal amounts. Mr. Jansen has $110,000 more than what the court had in its total. Okay. Thank you. And I tried in my argument to sort of chart it out to show if he had done it properly, how it actually came out, if he had included the number properly. Then the two other arguments that relate to the marital contribution to the Clayton Farm. One argument very quickly was there was tiling that was put onto the Clayton Farm during the marriage with marital funds. There was real estate appraiser called by Greg Jansen who testified that the tiling, in his opinion, improved, increased the value of the Clayton Farm by $250 an acre. And Mr. Jansen had testified that 102 acres of the Clayton Farm had been tiled. Therefore, there was evidence that the value of the farm had been increased by $48,000 as a result of the marital contribution of the tiling. Now, the judge did not include an amount of contribution for the tiling, saying that he, again, he talks about cash flow and having difficulty in determining the value. So he doesn't include a value. But the appropriate method of valuing or one appropriate method of valuing a contribution is the amount that the contribution increased the value of the real estate. So there was evidence. The evidence did show a $48,000 contribution, which we submit should have been part of the court's division of the allocation of the marital estate. Ms. Cherry, is it correct that the court basically found that there wasn't sufficient evidence to make that determination? The court talked about not having information on how much was spent on tiling each farm or how long it will remain functional or the dollar value of the increased productivity resulting from the tiling. So isn't it a situation where the court just felt that it didn't have enough evidence to make that determination? That's what the trial court said, but it did have the evidence. It had the evidence of how much this increased the value of the farmland.  I don't have that evidence that, were I an expert, I might use to say how much it increased the value of the farmland. But we had an expert who said how much it increased the value of the farmland, number one. Number two, there certainly was evidence that there was significant money that was put into the tiling. There was evidence that there was a total of $154,000 put into the tiling of all of their acreage. And the amount of acreage, based on the testimony of Mr. Jansen, that the amount of acreage in the Clayton farm, as opposed to all of their acreage that was tiled, was about 71%. So while there was an exact dollar amount of how much was paid, there certainly is a ballpark estimate that one could make of how much was put into the tiling, and it would be something over $100,000. But the other part of it would also be the fact that the marital estate benefited from the tiling, and you have to consider that in the equation, correct? That is something that can be considered. But I would point out the cases that Mr. Jansen cited, where they said, oh, okay, it was compensated, were ones where we're talking about the marriage spent $40,000 or $25,000. Here we're talking about something in the neighborhood of $100,000, number one. And it's also a benefit that Mr. Jansen has and will continue to have because he's retaining the farmland. So he will continue to receive benefit from it also. The trial judge didn't find that the marriage was adequately compensated for its contributions. He just basically said, well, I can't figure it out, therefore I'm not going to set anything. But again, the judge had the proper evidence for figuring it out. Thank you. Well, let me ask you then. You say he's going to get a benefit from this tiling. Tiling is property that depreciates, correct? Yes. Would you then accept the argument that depreciation should come off of the calculation for determining income? No. Why not? That seems inconsistent. First of all, this court has said repeatedly that it shouldn't, this particular appellate court. But the Supreme Court hasn't said that. It hasn't said that it should either, exactly. And generally, appellate courts have said that it should not. There are some cases that talk about allowing for straight-line depreciation to be subtracted, and that isn't what you deduct on your tax return. That's taking the actual life of the asset and figuring out, prorating the depreciation up to the actual life of the asset. And there are cases that say that if you want to try to get depreciation taken off, you have the burden of proving what you need to prove to get it taken off. So assuming that you wanted to deduct the case that talks about, the case that talks about using straight-line depreciation, there's no evidence in this case of how you could calculate the straight-line depreciation. I mean, there isn't any evidence of the straight-line depreciation. There's no evidence of the life of the things that were purchased. There's not that much evidence of what was purchased either. So basically to answer your question, this court has said no. Even if you did, this would not be a case for doing it. Getting back to the issue of the contribution, I'm sorry I made you digress. No, that's okay. That's fine. I was going to have to get there anyway. The third issue we raise about contribution really has to do with the method by which the court calculated the contribution. And I provide in the brief this article of taming transmutation, which at the time that the current provisions about contribution were put in the Illinois Bar Journal, there are a number of cases where that is cited to explain how the analysis should be made with respect to contribution. And in that case, in a situation where marital funds have contributed to the equity of an asset and non-marital funds have contributed to the equity of the asset, the analysis was that the contribution should be calculated as basically the proportion of contribution. The reimbursement to the marital estate should be calculated based on the proportion of contribution. And our case is, I think, a case which shows the reason for that. If you have a situation where there was $176,000 non-marital contribution and $134,000 marital contribution, and you have an asset that is now worth $1.7 million, both of the states have contributed to that equity in the asset, and therefore both the states should receive the benefit of that contribution to the equity of the asset. So actually the first argument in the brief, but the third one I'm discussing with regard to contribution, we would submit that the proper way to calculate the contribution in this case is to use the proportions of equity contributed by both states. But the court took the position that the marital residence, what I'll call it, even though it was owned by the corporation, was paid off before the marriage, correct? Well, no, the marital residence was never owned by the parties. Right. The marital residence was a separate issue, and the marital residence was not located on the Clayton farm. It's located in the middle of Mr. Jansen's parents' farm. And the Clayton farm, I'm sorry, was paid off before the marriage. Is that correct? I don't believe that is correct. I don't believe that's what the evidence shows. Well, there was a $134,000 mortgage, and that was premarital debt to the father. Isn't that correct? Here's what I believe the evidence shows, if I may. There was an initial mortgage of $210,000. In September, that gets paid off in the year before the marriage, 1979. And a short while later, there's a note executed, a promissory note and a mortgage to the corporation that is owned by Mr. Jansen's father. Now, they put on evidence, and I agree that the court accepted their evidence. They contended that that note was for 10 promissory notes. They contended that that $172,000 mortgage was for 10 promissory notes that Mr. Jansen had executed to his father's corporation. I believe, if you look at the evidence, that that cannot be true because the mortgage agreement, the $172,000 mortgage, said that it was being done for a single note executed this date in the amount of $172,000. Those 10 promissory notes, and I point out in my brief, these are form notes with handwriting. They're not notarized. Other than Greg Jansen testifying about them, we have no evidence of when they were actually executed. So, they are subject to, I think, a degree of suspicion. And his father, who testified, never testified about those notes. I'm sorry. Do you want me to finish my thought? Very quickly. Okay, very quickly. So, and the 10 promissory notes, the amounts, according to the handwriting that was outstanding when this $172,000 mortgage was done didn't total $172,000. They totaled $134,000. So, I submit that the evidence does not support a finding that that $172,000 mortgage was for those promissory notes. I, so. Okay. Thank you, counsel.  Mr. Heck. Thank you, counsel. May it please the court. First of all, I am assuming, and I think rightfully so, that there are many issues that Ms. Cherry did not argue. I don't believe she's abandoning those issues. So, if I do not get to a specific issue in my argument or my cross-appeal, please refer to the brief because I don't intend to abandon anything. I just may not have the time. I think that what happens here, what has happened throughout the argument of Ms. Cherry is, and I find no fault with this, I'm just stating as a matter of fact, that she did not try the case. She was not there. She didn't see the demeanor of the witnesses. She didn't see some of the incredible testimony that was given by Christie. Review the file, you'll see that there was, I can remember at least three bold-faced discrepancies that we pointed out to the court. We get into a situation that has been completely ignored by Ms. Cherry in this statement of against the manifest way of the evidence or that the court abuses discretion. None of those have happened in this case. I do believe that there has been some problem with this, and I would point out to the court, not in going through in any great detail, as Ms. Cherry said, I'll answer any question you've got, but just to go through her points. For example, when she says on D, and I'll start there only because of where she started, she primarily said that the valuation of farm assets were incorrect. She pointed out to the cattle minus debt, there's more to a farm operation than cattle minus debt in order to place a value. The court, we gave the court what we could give the court. At that point, Ms. Jansen did not give the court anything. Now what we've got or what we had there is we had cattle, yes. We had debt, yes. We had ongoing problems. Those cattle just don't sit there like a piece of machinery or a piece of equipment of some kind. They have to be fed. It costs money on a daily basis. These cattle have to be sold. They're not sold at auction for nothing. The auction people, the people that are managing these, these cattle are not on Jansen's, some of them, most of them were not on Jansen land. So all of this has to be put into a value, and I think Judge Bailey correctly put the value on those cattle because there was no way to know. Well, I think counsel's argument, Judge, or argument is that Judge Bailey didn't really come up with the value, just went to his chart, and at the end said to equalize, I'm going to take $15,818. I don't think that he had anything else he could have done with the moving target, so to speak. I don't see that he has abused any discretion or that it was against the manifest way to the evidence. Based upon all of this, it's like saying, well, this was worth so much, but what would they actually be worth if you sold them on that day? It's a moving target, so I don't think as far as reversal or setting it aside, I certainly don't think that there's been any statement or any factual basis put in this record to allow that to happen. When you get to consideration, I think we've got to look at consideration as far as the non-marital land, but I think before we get there, I think part of our cross-appeal is in the Hashmire land. The Hashmire land really is non-marital property. We believe that the court erred in calling the Hashmire land marital property. That is, as we put in our brief and as it is clearly shown, that where the Hashmire land came into effect was, in fact, through a like-kind exchange with the non-marital property of the DeGroote farm. There was never any name on the Hashmire land of Christy Jansen. She was never on any mortgage. She was never on any note. She was never on anything. The Hashmire land is clearly the non-marital property of Greg Jansen, and we do believe that the court erred in that. But... Well, how much in marital funds were used to purchase the Hashmire farm? Nothing. Really? Wasn't there a $30,500 down payment? That is the most that could have been done. That is the most that could have been done because it was a like-kind exchange. What I'm saying is... But the property that was involved in the like-kind exchange had a mortgage on it, didn't it? Yes. Was that for $85,000? It was for $85,000. So why would it be unreasonable to say that $85,000 plus $30,500 equals $115,500, and that was the marital contribution to the purchase of the Hashmire farm? It would be unreasonable to say because I believe it is our position and the position taken by the court that that was not funded with marital property. It was non-marital funds that was fed or paid for from accounts that were not marital in any means, nor for any marital purpose. You've got to remember that the Hashmire farm isn't the farm that is out by itself. The Hashmire farm is a farm that is part of what I'll call the Greg Jansen farming operation. So there was money being put into this. I think one of the things that's been ignored in Ms. Cherry's argument is the court can and always should, I believe, and I'll call it sweat equity. Who made this farm? Who put this together? Who did all the work? And there's no question from everything that we have heard, from everything presented in the arguments, from everything as far as contribution, there was no contribution by Christy. What she did was, is that she went to her home in the Ozarks. She did testify, and the record supports this, that once in a while during harvest time she'd bring a meal out for the guys. But as far as operating, as far as working, as far as sweating, I think we've got to go back, and that's on one of our cross appeals as far as her needing maintenance. You're talking about sweat equity. The facts show that this farm, the Hashmeyer farm, was purchased during the marriage. The DeGroote farm had a debt on it that was paid during the marriage. So are you suggesting that we deviate from the Illinois Marriage and Dissolution Act and look at sweat equity instead of the presumptions that are under the act? No, I'm not suggesting that at all. What I'm suggesting to you is it was a non-marital piece of property. If in fact, and there's nothing that hasn't been rebutted in the evidence, the DeGroote farm was clearly non-marital property. There was a like-kind exchange for the Hashmeyer farm. In addition to some funds from marital savings. In addition to some funds. But it was never put into Christy Jantz's name. None of the mortgages on that property or none of any of the bank accounts, the farm accounts were ever in Christy's name. She said it was. We called the bank president or the bank secretary to testify that it wasn't. So at most, if you're going to put a contribution, it should not be marital property. It should be $85,000. Let's say that we have marital and non-marital property and they're commingled. And the result is a loss of the identity. Then doesn't that become marital property? If it's commingled. And I don't believe it was. Not on the Hashmeyer farm. Thank you. As far as the tiling is concerned. We get to the tiling. Again, what's been ignored here is this is an appreciable asset. The tiling, you don't put it down at last. When you put the tiling down, the day you put it down, it starts deteriorating. There was no evidence that the tiling increased the value of that. If, in fact, you determine that it did, then there's a limited amount of equity, even in the Hashmeyer farm. If you take the $250 an acre and you assume that that's true, which I don't believe that it is based upon the entire record. If you believe that to be true, then you've got a situation where at most you've got $250 per acre when it was put on the farm. But that's not supported by the record. You've got to show, first of all, that the increase in value of that was not only because of the effort, but also show that it was because anything other than the natural increase of land value. And I don't believe that Christy or her attorney at trial reached anywhere near that burden as far as the, again, the sweat equity. When you divide, and I'm going back now, but when you divide sweat equity, or when you divide property, you look at who, under the Illinois Marriage and Dissolution of Marriage Act, you look at who contributed to it. Just because there was a, if you find that the judge was right, finding that the Hashmeyer farm was what it was, or even as Ms. Cherry argues, that there was a division, it shouldn't be 50-50. You've got to look at who made this marital asset. I think you've got to look back in that same situation as we pointed out in our brief, that Christy, for most of the marriage, was not, she lived on the farm. She certainly got the benefits of the farm. She got the benefits of the movement, the vacations. She got the benefit of the home. She got the benefits of the lifestyle. She got the benefits of the car. She got all the benefits of whatever the marital estate was generating. But she was out. She was out working in various businesses as she can work. And part of our brief is saying that she should not have gotten permanent maintenance. She has got absolutely no incentive to do anything. What she's got now is she's got the free ride. She's a young woman. She's a healthy woman, all supported by the record. She is a woman who does not work by her choice. Can she work? As we put in our brief, she's got occupational skills. She works part-time when she feels like working, but during the marriage. Excuse me, counsel. Isn't she entitled to the lifestyle that she was accustomed to during the marriage? I mean, the record shows she, and I'm assuming this was a joint decision, stayed home and had children and raised the couple's children. The one child is gone. Another child will be gone very, very quickly now. I do not disagree or do not argue that she's not entitled. That should not be considered. But I think before I go beyond this, I think we've got to look at the fact that during this marriage that she had, she meaning Christy, is able to work. And there is an affirmative duty that she has to go out and try to support herself in some form. She just can't. She's not taking care of the children anymore. They're not babies. She's moved not only off the farm, she moved out of the home that she was living in and now is living in a home that belongs to another individual. So to say that she is entitled to the same lifestyle, well, I have no argument with that. But I do think we've got to look at the fact that during this marriage that she did work at several different occupations and she's got skills. She's got, she worked at the Touch of Class beauty salon. She worked at Christy's flower pot, went belly up. She worked at the Griffin Center, an event planner. She's still doing that. From the record, it's reported that she did that down in the Ozarks for several benefits, so she called it. But she's certainly capable of doing it because she counted those as a success. Then she worked at Ritzy Renovations with her mother. All those things during the course of the marriage used up marital funds and failed. Or she stopped doing them. So I think that is very important. I think, and I know, and we believe along the lines of the maintenance is concerned, we ask you to review in our cross-appeal and to look at the testimony concerning the Victor Bowman Trust. The judge basically said, and I think that is supported by the law, but it's not supported by the facts in this case, if she had a future interest that was not vested, then I think we'd be talking about something else. But the facts are that she has an elderly mother, that she has a vested interest and had one at the time of trial. 2.29% of income interest was she used. 43% of ownership interest, which she still has, depending on what her mother wants to give her, but they used this. She's got a $270,000 in the Bowman Family Trust, but she owns a Bowman Family Trust with her mother in the Ozarks. She's taken $10,000 worth of monies to buy a boat. It's over and over as a repeat with these things. If you look at, on the other hand of this, and I think we have to look at the depreciation because Mr. Jansen is a farmer. He has to complete, he has to complete a cycle. If he doesn't do these things, then the farmland goes fallow or nonproductive to the degree that it should. He has to keep fertilizing. She got the benefit of this. If you look and you see, when they got married, they got married in September, the crop was ready to harvest. That was all non-marital when they got married. She got the benefit of that. She got the benefit of that money. She got the benefit of the lifestyle. She got the benefit of the home. She got all these benefits, but now she says, well, look at the contribution. What contribution, and I don't take this. I think it's a contribution that must be considered, but as far as the living in the home and being mother in the home, the record supports the fact. She's in the Ozarks almost all summer long. She's very seldom home. She has been for years. That's what she's done. So I think when we look at the whole picture, we look at the tiling, we look at the Mathis case, we look at the jobs. I think then we go full circle into this depreciation because at this point, I think we have to look at the reality that there's only so much water in this well. Whether you want to call it marital property or whether you want to call it non-marital property, there's only so much money that this can produce. And one thing that the court did give, the court did give her a lump sum of money, and she had been paid that money. She had been paid to date, if you calculate what's in this order, to date she's been paid $891,553. Of that, she's got cash in hand of $847,301. Now, what does that mean? Well, where does the money come for the maintenance? Because that money had to be borrowed. The court found that and we knew that. There was no cash on hand. The cash on hand to pay her off had to be borrowed. That's going to cost $47,000 a year for the next 20-some years to put that money in her hand. That has to be considered, I believe, when you order maintenance. He has ordered to pay child support. The child support, he was paying $33,000 a year in child support. And he's got to make approximately $59,000 before taxes before he can pay even his child support. Then you put the $47,000 on top of that, plus any maintenance, I think that the dog doesn't hunt. There's just not enough money there. At the same time, he's using all of his assets. He's not selling assets. What he's doing is continually doing what he has been. I don't mean to anything by this. He's a farm boy. That's all he knows. That's all he wants to be is a farmer. And to do otherwise, if he starts selling off the farms, if he starts selling off money, if he starts invading all of these things, then he's got no money to even keep moving, if you will, to pay any child support, which that's going to go on for some years. I realize I'm running out of time and I've got one more thing that I at least want to touch upon. Before you do touch upon that, counsel, I have a question. Sure. The court relied upon something called Document A in deciding what the proper amount of income to assign your client was. We don't have that in the record. What do you say to that? The Document A was not set up here. I don't know why it wasn't set. I don't know what the court did with it. Document A was a list that I believe that we prepared. I could be wrong on this. I believe that we prepared that. But the court in that document ignored certain things. But we don't have that document. I understand. I'm not in charge of the record. I'm not arguing. I'm just saying I'm not the clerk of the court. But essentially what happened there, and you can add the numbers, and you can tell by adding those numbers that we've got a situation where if you add the numbers, again, you don't have the money being made. We had two testimonies. We had the testimony of Rosemary Nesbitt, which was the hired gun, if you will, hired by Ms. Jansen. That's her right. Then we had Ms. Drebbler, who was a longtime family accountant. Other than the one year in the record, this family made on an average, I believe, of about, I don't know, $73,000. $73,580. That's what it made the last year. That's what it is. And if you look at all these, if you look at what's in order to be paid, he cannot pay the permanent maintenance. The money is not there. They didn't take any depreciation. He's a farmer. I understand the law of depreciation. We put all the evidence as far as depreciation. If he had leased that equipment, it would have came right off the top. There should be something taken for the depreciation, at least give him an opportunity to refurbish his accounts. One more thing, and I know I have to go. Make it quick, please. Quick. The money, the $10,000 division, wasn't there. Look at the record. The $10,000 that Greg said he put it away, which he did put it away, he used. We defined where we put it. Christmas, bought gold, bought silver, et cetera. The values are all off. But it's in the record. As I said in the beginning, please review my – I missed a lot. I didn't have time. So please review my – It's a big record. We'll review it all. I know you will. Both of that. Thank you very much.  Rebuttal, please. With regard to the document that you just referred to, my understanding was that the court referred to the tax returns. He used the information in the tax returns in calculating child support. So I'm not sure what document it is. Apparently the court noticed something that didn't register with me, that there was some document we didn't have. So you don't think there's even such things as document A? I'm sorry? You don't think there is such things as document A? Judge, if you could actually show me where it was that he said that I was paging through, because it did not register. And as the court knows, this is an extremely lengthy record with innumerable exhibits and pretrial memorandums. I'll certainly take another look at the record. I think the respondent had submitted something called document A, and I think the trial court indicated that it utilized that in making its income calculation. And in fact, I thought your client had objected to it because it wasn't done properly in accordance with the prior court order. That could be. I really just don't recall that, Judge. Looking at the memorandum of the trial court, he uses the numbers from the five years of tax returns, as I read it. So I'm not sure what was on this document, but I'm looking at page 19 of his memorandum, which is C1336 of the record. And he's just going through the information taken right from the tax returns. Now, there was the question of the value of the perks. And by perks, I mean the benefits that Mr. Janssen got from his parent company's, you know, the house, paying his medical bills, paying his insurance. I don't remember everything else, but there was that. And that was additional income that the court imputed. And there were differences in Ms. Nesbitt's testimony of those values and Ms. Jebalia, Mr. Janssen's expert's testimony of the values. The court made its own determination. And perhaps what we're talking about was those schedules. Because if you look, there's also these pretrial affidavits that had numerous attachments to them also. Maybe it's in that. I'm just not sure. And as I said, it wasn't something registered. But just very quickly, with regard to child support, there's a lot of argument by Mr. Janssen about Ms. Nesbitt and why her calculations weren't correct. The judge didn't rely on her calculations. He used the tax returns with regard to what the value should be imputed for the free home. He listened to what she had to say. He listened to what the real estate appraiser that Mr. Janssen introduced had to say. And he arrived at his own values. So what Ms. Nesbitt said is not what the judge determined in terms of the income. Very quickly, with regard to the Victor Bowman Trust. The Victor Bowman Trust, they have what are called shares. Income shares and land ownership shares. If you read the trust document, the land ownership shares that Christy Janssen has at this point don't give her anything in terms of control, access to the land. Nothing can happen until her mother is dead with regard to those land ownership shares. Basically, what they were doing is they were saying, while the mother's alive, she controls it. There's a small amount of income we're going to impute to Christy. And by the way, the evidence was Christy never gets the income. And if you look at the tax returns, the amount of income is $200, say, in 2008. $800 in 2009. Very small amounts of income from that trust that she's taxed for. But she doesn't actually receive the income. But in terms of the ownership shares, it doesn't mean anything until her mother dies. And then something occurs. We submit that we're properly determined. We don't know if, as, when she's going to get this. And that it wasn't something for the judge to determine in dividing the marital estate or in determining child support and maintenance because she's not receiving anything of significance now. I'll stand up. I've briefed on everything else. Okay. Thanks to both of you. The case is submitted and the court stands in recess.